AUSTIN MAINT. & CONSTR., INC. v. CROWDER CONSTR. CO.

[224 N.C. App. 401 (2012)]

AUSTIN MAINTENANCE & CONSTRUCTION, INC., Plaintiff

v.

CROWDER CONSTRUCTION COMPANY and STEVE LANIER, Defendants

No. COA12-201

Filed 18 December 2012

## 1. Fiduciary Relationship—breach of fiduciary duty—employer-employee relationship—no exercise of dominion

The trial court did not err by granting summary judgment in favor of defendant Lanier with respect to plaintiff's breach of fiduciary duty claim. There was no genuine issue of material fact regarding whether defendant Lanier owed a fiduciary duty to plaintiff as a result of their employer-employee relationship as defendant Lanier's status as the foreman of a four-person crew did not "uniquely position" him to exercise dominion over plaintiff.

## 2. Contracts—tortious interference with contract—existence of valid contract

The trial court did not err by granting summary judgment in favor of defendants with respect to plaintiff's tortious interference with contract claim. Plaintiff failed to forecast evidence tending to show the existence of a valid contract between plaintiff and a third person which conferred upon plaintiff a contractual right against a third person, the first element required to establish a tortious interference with contract claim.

## 3. Unfair Trade Practices—workforce not surreptitiously raided—arguments meritless

The trial court did not err by granting summary judgment in favor of defendants with respect to its unfair or deceptive trade practices claim. The record failed to support plaintiff's assertion that defendants "surreptitiously raided" plaintiff's workforce and plaintiff's remaining arguments were meritless.

## 4. Conspiracy—civil conspiracy—injunctive relief

The trial court did not err by granting summary judgment in favor of defendants with respect to its civil conspiracy claim and its request for injunctive relief. Having already considered and rejected the arguments upon which plaintiff based these claims, plaintiff's argument was meritless.

AUSTIN MAINT. & CONSTR., INC. v. CROWDER CONSTR. CO.

[224 N.C. App. 401 (2012)]

Appeal by plaintiff from judgments entered 2 November 2011 by Judge Calvin E. Murphy in Mecklenburg County Superior Court. Heard in the Court of Appeals 14 August 2012.

*Moye, O'Brien, O'Rourke, Pickert & Dillon, LLP, by J. Andrew Williams, Stephen W. Pickert, and Peter C. Anderson, for plaintiff-appellant.*

*Erwin, Bishop, Capitano & Moss, P.A., by Joseph W. Moss, Jr., for defendant-appellee Steve Lanier.*

*Johnston, Allison & Hord, P.A., by Michael L. Wilson and Kerry L. Traynum, for defendant-appellee Crowder Construction Company.*

ERVIN, Judge.

Plaintiff Austin Maintenance & Construction, Inc., appeals from orders granting summary judgment in favor of Defendants Steve Lanier and Crowder Construction Company with respect to Plaintiff's breach of fiduciary duty claim, which had been asserted solely against Mr. Lanier; Plaintiff's claims for tortious interference with contract, unfair or deceptive trade practices, and civil conspiracy, which had been asserted against both Defendants; and Plaintiff's request for injunctive relief. On appeal, Plaintiff argues that the trial court erred by granting summary judgment in favor of Defendants on the grounds that the record reveals the existence of genuine issues of material fact concerning whether Mr. Lanier breached a fiduciary duty that he owed Plaintiff and whether Defendants tortiously inter-fered with a contract between Plaintiff and The Timken Company, engaged in unfair or deceptive trade practices, and participated in a civil conspiracy, and on the grounds that Plaintiff was entitled to injunctive relief. After careful consideration of Plaintiff's challenges to the trial court's orders in light of the record and the applicable law, we conclude that the trial court's orders should be affirmed.

## I. Background

### A. Substantive Facts

Timken operates a "tapered roller bearing" manufacturing plant in Randleman, a town near Asheboro. Timken personnel refer to this facility as the Asheboro plant. Between 2006 and 2010, Sanders Brothers Inc. provided construction-related maintenance services at Timken's Asheboro plant and several other Timken plants pursuant to

AUSTIN MAINT. & CONSTR., INC. v. CROWDER CONSTR. CO.

[224 N.C. App. 401 (2012)]

a Master Service Agreement (MSA). The MSA set out the general terms and conditions which would apply to specific contracts into which Timken and Sanders might enter in the future. The MSA did not provide for the provision of specific services or obligate either party to enter into specific contracts; instead, the MSA provided that Timken would execute Purchase Orders memorializing any future contracts between the parties.

In 2010, Sanders experienced serious financial difficulties. At that point, Rick Flickinger, the manager of Timken's Asheboro plant, investigated the possibility of procuring construction-related maintenance services from a different company. In the course of that process, Crowder, which competes with Plaintiff in the construction maintenance business, made Mr. Flickinger's "short list." However, after Sanders Brothers assigned its rights under the MSA to Plaintiff effective on 9 June 2010, Plaintiff assumed responsibility for providing construction-related maintenance services at Timken's Asheboro plant instead.

At the time that Plaintiff began providing construction maintenance services at the Asheboro plant, Mr. Lanier had been employed at that facility for twelve years, with the last six years of that period having been spent as a Sanders Brothers employee. Mr. Lanier supervised a crew consisting of three other men who had also worked at the plant for at least five years—James Moore, Willard McDaniel, and Earl Turner.[1] The crew performed various tasks at the direction of Mr. Flickinger, including welding, metal fabrication, wiring, repairing the water pipes and coolant system, pipe fitting, and performing other machine repairs. In addition, Timken had a "tendency to rearrange machines" in the Asheboro plant, so Mr. Lanier's crew was involved in implementing these "machine moves" as well. The machines were very large; moving them required a complex series of procedures including the performance of some construction-related work.

After Plaintiff purchased Sanders Brothers' rights under the MSA, it hired Mr. Lanier and the other members of the crew as hourly, at-will employees. Mr. Lanier continued to serve as crew foreman after coming into Plaintiff's employment; his immediate supervisor was Jack Richardson, one of Plaintiff's General Managers. As crew superintendent and Plaintiff's highest ranking employee at the Asheboro

---

1. Mr. Lanier's crew originally included a janitor named Juan Estrada. However, Crowder did not hire Mr. Estrada because of questions about his immigration status. As a result, all references to Mr. Lanier's crew throughout the remainder of this opinion should be understood as encompassing only the four individuals named in the text.

plant, Plaintiff had additional responsibilities over and above those assigned to the other crew members. Among other things, Mr. Lanier supervised the crew, coordinated their work on specific projects, and had the right to select crew members and request pay raises. Mr. Lanier also had certain record-keeping responsibilities, including documenting compliance with safety regulations, overseeing weekly employee time sheets, and preparing documents that Plaintiff used to generate invoices and prepare other reports. Finally, Mr. Lanier functioned as the primary source of communication between his crew and the individuals directly responsible for operating Timken's Asheboro plant and Plaintiff. Mr. Lanier did not work from an office; instead, he performed his supervisory tasks while working with the rest of the crew on construction-related maintenance projects. Neither Mr. Lanier nor any other member of the crew was asked to sign a non-competition agreement, a non-solicitation agreement, or a confidentiality agreement.

Within a month after becoming employed by Plaintiff, the members of the crew became dissatisfied with the manner in which Plaintiff handled certain administrative issues, the amount of paperwork that Plaintiff required, and the manner in which Plaintiff responded to their concerns. As a result, all four crew members began looking for other employment during the summer of 2010.·

On 14 July 2010, James Moore called Brian Gossett, a Crowder employee with whom James Moore had worked when both were employed by Sanders Brothers at the Asheboro plant. At that time, James Moore, who wanted to "get away from [Plaintiff]," asked Mr. Gossett if he might obtain employment at Crowder. After Mr. Gossett indicated that Crowder was always looking for good workers, James Moore gave him Mr. Lanier's phone number. Mr. Gossett, in turn, agreed to provide Mr. Lanier's phone number to Tracy Moore, who held a management position with Crowder.

On the following day, Tracy Moore called Mr. Lanier. At that time, Mr. Lanier and Tracy Moore discussed the possibility that Mr. Lanier's entire crew would begin working for Crowder. During that conversation, Mr. Lanier asked Tracy Moore to send him information concerning the salary and benefit package that Crowder would be in a position to offer to members of the crew.

Mr. Lanier also talked to Mr. Flickinger about the possible change. Among other things, Mr. Lanier told Mr. Flickinger that he did not want to continue working for Plaintiff and that the crew com-

plained about Plaintiff "several times a week." After speaking with his supervisors, Mr. Flickinger informed Mr. Lanier that, instead of being contractually obligated to work with Plaintiff, Timken was free to procure specific construction-related maintenance services from Crowder rather than Plaintiff. In addition, Mr. Flickinger told Mr. Lanier that he would like the crew to stay at the Asheboro plant regardless of whether they were employed by Plaintiff, Crowder, or some other company. After receiving this information, Crowder provided salary and benefits information to Mr. Lanier, submitted a proposal under which Crowder would perform work at Timken's Asheboro plant to Mr. Flickinger, and completed the documentation required for Crowder to become qualified to provide construction-related maintenance services at the Asheboro plant.

Between July and October of 2010, the crew had frequent discussions concerning their dissatisfaction with Plaintiff and the possibility that they might begin working for Crowder instead. On 23 August 2010, Mr. Richardson received an email from Caleb Rice, one of Plaintiff's safety managers, in which Mr. Rice stated that:

> I just wanted to send you guys a note reflecting on my visit with Steve Lanier at Timken Asheboro last week. . . . I would regret not letting you know the concerns that Steve has voiced to me, and knowing Steve as a very honest and straightforward person, these are not idle threats. . . . Steve is looking at other contactors to work for in the Timken Asheboro plant, and right now the only thing stalling the change is which company will offer the best pay and benefits. First of all, Steve says that he does not want to change companies, he feels that they have been through enough without having to go through another change, but the crew up there will not continue working with all of these issues. The following are some of the issues that he has had over the last two months. . . . .

On the following day, Mr. Richardson traveled to the Asheboro plant and met with Mr. Lanier, Mr. Flickinger, and the other members of the crew for the purpose of discussing issues that were of concern to the crew. However, the crew continued to be dissatisfied with their status as employees of Plaintiff.

On 27 September 2010, the members of the crew met with Tracy Moore to discuss working for Crowder. Although the benefits offered

AUSTIN MAINT. & CONSTR., INC. v. CROWDER CONSTR. CO.

[224 N.C. App. 401 (2012)]

by Crowder were not as favorable as those already provided by Plaintiff, the entire crew decided to quit working for Plaintiff and to go to work for Crowder. As a result, on 7 October 2010, the crew traveled to Crowder's Spartanburg, South Carolina, office, where they completed job applications and were hired to work for Crowder beginning on 18 October 2010.

The crew was involved in moving a very large and complex machine during the following week. On 14 October 2010, which was a Thursday, they worked three hours overtime in order to make sure that the machine move had been sufficiently completed that a regular Timken employee or contractor could finish the job without a loss of production capability if something prevented the crew from returning on Monday as Crowder employees. After finishing work on 14 October 2010, Mr. Lanier called Mr. Richardson and informed him that he, Mr. McDaniel, Mr. Turner, and Mr. Moore were resigning. On the following Monday, 18 October 2010, Mr. Lanier and the other crew members returned to work at the Asheboro plant as Crowder employees.

B.  Procedural History

On 3 November 2010, Plaintiff filed a complaint in which it sought damages from both Defendants based on claims sounding in tortious interference with contractual relations, unfair or deceptive trade practices, and civil conspiracy and an additional claim against Mr. Lanier for breach of fiduciary duty. In addition, Plaintiff sought the issuance of a permanent injunction barring Crowder from providing construction-related maintenance services at the Asheboro plant. On 3 January 2011, Defendants filed separate answers in which they denied the material allegations of Plaintiff's complaint; asserted various affirmative defenses; sought dismissal of Plaintiff's complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6); and requested an award of attorneys' fees. On 20 April 2011, Judge Richard D. Boner entered an order denying Defendants' dismissal motions and allowing Plaintiff's request to amend its complaint.

On 26 April 2011, Plaintiff filed an amended complaint in which it asserted the same claims that had been asserted in its original complaint. In essence, Plaintiff alleged that Defendants had "knowingly conspired" to "implement a predatory scheme" by which the crew would resign "*en masse*" in "the middle of a critical machine move" on 14 October 2010 and that, given that set of circumstances, Mr. Flickinger "had no choice" but to use Mr. Lanier's crew, in their capacity as Crowder employees, for needed construction-related mainte-

nance services. On 1 June 2011, Defendants filed answers in which they denied the material allegations of the amended complaint, asserted various affirmative defenses, sought dismissal of Plaintiff's claims for failure to state a claim for which relief could be granted, and requested an award of attorneys' fees.

On 2 September 2011, Defendants filed motions seeking the entry of summary judgment in their favor with respect to all of Plaintiff's claims. The trial court conducted a hearing for the purpose of addressing the issues raised by Defendants' summary judgment motions on 14 September 2011. On 2 November 2011, the trial court entered summary judgment orders in favor of Defendants with respect to all of the claims that had been asserted in the amended complaint. Plaintiff noted a timely appeal to this Court from the trial court's orders.

## II. Legal Analysis

### A. Standard of Review

An award of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). "A party moving for summary judgment may prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citations omitted). "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002) (citing *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)). However, "[o]nce the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784-85, 534 S.E.2d 660, 664, *disc. review denied*, 353 N.C. 262, 546 S.E.2d 401 (2000), *cert. denied*, 353 N.C. 371, 547 S.E.2d 810, *cert. denied*, 534 U.S. 950, 122 S. Ct. 345, 151 L. Ed. 2d 261 (2001).

"A genuine issue of material fact arises when 'the facts alleged . . . are of such nature as to affect the result of the action.' " *N.C. Farm*

*Bureau Mut. Ins. Co. v. Sadler,* 365 N.C. 179, 182, 711 S.E.2d 114, 116 (2011) (quoting *Kessing v. Mortgage Corp.,* 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971) (citation and quotation marks omitted)). "On a motion for summary judgment the court may consider evidence consisting of affidavits, depositions, answers to interrogatories, admissions, documentary materials, facts which are subject to judicial notice, and any other materials which would be admissible in evidence at trial." *Huss v. Huss,* 31 N.C. App. 463, 466, 230 S.E.2d 159, 161-62 (1976) (citations omitted). " 'When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party.' " *In re Will of Jones,* 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting *Dalton v. Camp,* 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)).

The "standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." *Bruce-Terminix Co. v. Zurich Ins. Co.,* 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998), *mod. on other grounds, Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.,* 364 N.C. 1, 7, 692 S.E.2d 605, 611 (2010). A trial court's decision to grant a summary judgment motion is reviewed on a *de novo* basis. *Va. Elec. & Power Co. v. Tillett,* 80 N.C. App. 383, 385, 343 S.E.2d 188, 191, *cert. denied,* 317 N.C. 715, 347 S.E.2d 457 (1986). We will now utilize this standard of review for the purpose of analyzing the appropriateness of the trial court's decision to grant summary judgment in favor of Defendants.

### B. Breach of Fiduciary Duty

[1] In its first challenge to the trial court's order, Plaintiff contends that the trial court erred by granting summary judgment in favor of Mr. Lanier with respect to Plaintiff's breach of fiduciary duty claim. In support of this argument, Plaintiff asserts that the record discloses the existence of genuine issues of material fact regarding the extent to which Mr. Lanier owed a fiduciary duty to Plaintiff and whether he breached that duty. Plaintiff's argument lacks merit.[2]

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which 'there has been a spe-

---

2. Although Plaintiff makes much of allegedly unsupported "findings" of undisputed fact in the trial court's order, we need not address its specific complaints about these "findings" given that we have been able, based on our own review of the record, to determine what the undisputed record evidence tends to show.

cial confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . and in which there is confidence reposed on one side, and resulting domination and influence on the other.' " *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707-08 (citing *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984), and quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). " '[I]n North Carolina . . . there are two types of fiduciary relationships: (1) those that arise from legal relations such as attorney and client, broker and client . . . partners, principal and agent, trustee and *cestui que* trust, and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.' " *Ellison v. Alexander*, 207 N.C. App 401, 408, 700 S.E.2d 102, 108 (2010) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (internal citation omitted).

> Business partners, for example, are each other's fiduciaries as a matter of law. In less clearly defined situations the question whether a fiduciary relationship exists is more open and depends ultimately on the circumstances. Courts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified. Thus, the relationship can arise in a variety of circumstances . . . and may stem from varied and unpredictable factors.

*Hajmm Co. v. House of Raeford Farms*, 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991) (citing *Casey v. Grantham*, 239 N.C. 121, 124-25, 79 S.E.2d 735, 738 (1954) (other citation omitted).

The undisputed evidence tends to show that Mr. Lanier was the foreman of a crew that consisted of four men, including himself; that his job duties were confined to performing various tasks related to the provision of construction-related maintenance services; and that his employment was terminable at will by Plaintiff. Under that set of circumstances, we have no difficulty in concluding that Mr. Lanier did not occupy the type of fiduciary relationship with Plaintiff that arises by operation of law, such as that inherent in an attorney-client relationship. As a result, the only way in which a fiduciary relationship between Plaintiff and Mr. Lanier could have existed would be if Plaintiff reposed trust and confidence in Mr. Lanier, resulting in a situation in which Mr. Lanier exercised "superiority and influence" over Plaintiff.

Although our appellate jurisprudence does not precisely define when a fiduciary relationship of this second type does or does not exist, "the broad parameters accorded the term have been specifically limited in the context of employment situations. Under the general rule, 'the relation of employer and employee is not one of those regarded as confidential.'" *Dalton*, 353 N.C. at 651, 548 S.E.2d at 708 (quoting *King v. R.R.*, 157 N.C. 44, 62-63, 72 S.E. 801, 808 (1911) (other citation omitted). As a result, in the absence of some unusual set of facts that would suffice to differentiate the relationship between Plaintiff and Mr. Lanier from other employer-employee relationships, Mr. Lanier did not have a fiduciary relationship with Plaintiff.

According to the record, Plaintiff's corporate parent has over 7,000 employees and an annual income of approximately $300,000,000.00 to $500,000,000.00, of which Plaintiff's work at Timken's Asheboro plant generated approximately $2,000,000.00, or .04 percent to .06 percent. Of these 7,000 or so employees, only five were working at the Asheboro plant, which Plaintiff characterizes as a "remote" company site. As we have already noted, Mr. Lanier was an hourly, at-will employee charged with supervising a four-person crew. The record contains no evidence tending to show that Mr. Lanier played any role within Plaintiff's organization except for that of a foreman overseeing a crew performing construction-related maintenance services. In light of that set of facts, we conclude that any confidence that Plaintiff reposed in Mr. Lanier consisted of nothing more than relying on him to competently perform his assigned duties. Simply put, given that the record demonstrates that Mr. Lanier was a relatively small cog in a very large operation, we have no hesitation about concluding that Mr. Lanier exercised little or no control over Plaintiff's overall operations and that Mr. Lanier did not owe any fiduciary duties to Plaintiff.

In attempting to persuade us to reach a contrary conclusion, Plaintiff stresses the degree of responsibility and authority assigned to a foreman such as Mr. Lanier and argues that he had considerable responsibility for, and authority over, the other crew members. However, the fact that Mr. Lanier had responsibility for ensuring the proper performance of construction-related maintenance tasks assigned to his crew by Mr. Flickinger simply does not make him Plaintiff's fiduciary. As the Supreme Court observed in *Dalton*:

> . . . [T]he managerial duties of Camp were such that a certain level of confidence was reposed in him by Dalton; and (2) as a confidant of his employer, Camp

was therefore bound to act in good faith and with due regard to the interests of Dalton. In our view, such circumstances, as shown here, merely serve to define the nature of virtually all employer-employee relationships; without more, they are inadequate to establish Camp's obligations as fiduciary in nature. No evidence suggests that his position in the workplace resulted in "domination and influence on the other [Dalton]," an essential component of any fiduciary relationship. Camp was hired as an at-will employee to manage the production of a publication. . . . [H]is responsibilities were not unlike those of employees in other businesses and can hardly be construed as uniquely positioning him to exercise dominion over Dalton.

*Dalton* at 651-52, 548 S.E.2d at 708 (quoting *Abbitt*, 201 N.C. at 598, 160 S.E. at 906). Thus, for essentially the same reasons that underlie the Supreme Court's decision in *Dalton*, we conclude that Mr. Lanier's status as the foreman of a four-person crew did not "uniquely position" him to exercise dominion over Plaintiff.

We have carefully considered Plaintiff's remaining arguments in support of its claim that Mr. Lanier breached his fiduciary duty owed to Plaintiff, and conclude that they lack merit as well. For example, Plaintiff contends that there are disputed issues of fact regarding the scope of Mr. Lanier's responsibilities and authority given Plaintiff's contention that Mr. Lanier "participated in any discussions [with] plaintiff's officers concerning management level decisions or operations of the company concerning cash flow, lines of credit, issuance of stock or debt and the like." However, the only evidentiary support that Plaintiff has offered for this argument is the fact that Mr. Lanier had supervisory responsibility for a four-person crew and that he reported to Mr. Richardson, one of Plaintiff's managers. The undisputed record evidence shows that Mr. Lanier only interacted with Mr. Richardson concerning matters affecting his four-person crew; nothing in the record suggests that Mr. Lanier was ever involved in making any "management level decisions" as that term is ordinarily understood. Similarly, Plaintiff asserts that issues of fact regarding the extent to which Mr. Lanier owed a fiduciary duty to Plaintiff arise from language in the MSA spelling out Plaintiff's obligation to employ on-site supervisory personnel. However, the relevant language from the MSA, which has no binding effect unless Timken actually con-

tracted with Plaintiff to perform specific work at the Asheboro plant, provides no additional basis for concluding that Mr. Lanier had a fiduciary relationship with Plaintiff. Moreover, Plaintiff argues that the fact that Mr. Lanier was an hourly at-will employee and had not been asked to sign a non-competition agreement or similar documents is "immaterial to whether [Plaintiff] reposed trust and confidence in [Mr.] Lanier resulting in [his] domination and influence on [Plaintiff] at the Timken Asheboro plant site." In view of the fact that the presence or absence of such agreements did shed light on the nature of the relationship between Plaintiff and Mr. Lanier, we believe that the trial court properly considered these factors in determining whether to grant summary judgment in favor of Mr. Lanier. As a result, none of Plaintiff's attempts to persuade us that there were genuine issues of material fact concerning the extent, if any, to which Mr. Lanier owed a fiduciary duty to Plaintiff have any merit.

Similarly, we are unable to agree with Plaintiff's contention that the Supreme Court's decision in *Sara Lee Corp. v. Carter,* 351 N.C. 27, 519 S.E.2d 308, *rehearing denied,* 351 N.C. 191, 541 S.E.2d 716 (1999), supports its contention that Mr. Lanier breached a fiduciary duty that he owed Plaintiff. In *Sara Lee,* the defendant's job description required him to provide the plaintiff " 'with the best possible pricing, availability, and support of hardware and services.' " In violation of this obligation, the defendant started his own company and "engaged in self-dealing by supplying Sara Lee with computer parts and services at allegedly excessive cost while concealing his interest in these businesses." *Sara Lee,* 351 N.C. at 29, 519 S.E.2d at 309. On these facts, we upheld the trial court's conclusion "that defendant owed a fiduciary duty to Sara Lee with respect to his role in recommending the purchase and ordering of computer parts and related services for Sara Lee and that defendant breached that fiduciary duty[.]" *Sara Lee* at 30, 519 S.E.2d at 310. However, the alleged breach of fiduciary duty at issue in *Sara Lee* is very different from the alleged breach of fiduciary duty at issue here. According to Plaintiff:

> The record evidence establishing that the self-dealing [Mr.] Lanier was a fiduciary of [Plaintiff] is even stronger than that of the employee in *Sara Lee.* [Plaintiff] entrusted and authorized its Site Manager [Mr.] Lanier to interact with its valued customer Timken and to manage and supervise the other [Plaintiff] employees at the site. [Mr.] Lanier maintained and repaired unique machinery for [Plaintiff's] customer

> Timken. For [Plaintiff's] benefit he was supposed to maintain a strong relationship with [Mr.] Flickinger and provide other support as needed. . . . Instead, [Mr.] Lanier acted to benefit himself to the strong detriment of his employer, [Plaintiff].

However, the record contains no evidence that Mr. Lanier failed to "manage and supervise the other [Plaintiff] employees at the site," to "maintain a strong relationship with [Mr.] Flickinger," to perform any other duty arising from his job description, or to refrain from engaging in self-dealing. On the contrary, the sole basis for Plaintiff's claim that Mr. Lanier engaged in "self-dealing" and acted "to benefit himself to the strong detriment of his employer" is the fact that Mr. Lanier resigned from his employment with Plaintiff in order to work for Crowder because he "was clearly not happy working for [Plaintiff]" and saw a "switch to Crowder as being in his long-term best interests from a job satisfaction perspective." However, the fact that an at-will employee stops working for one employer, as the result of personal dissatisfaction with his existing position, and goes to work for another, who then takes over work that had previously been performed by the employee's original employer, is not consistent with any recognized definition of "self-dealing," see Black's Law Dictionary 1390 (8th ed. 2004) (defining self-dealing as "[p]articipation in a transaction that benefits oneself instead of another who is owed a fiduciary duty"), and does not bear any significant resemblance to the facts at issue in Sara Lee.

In addition, Plaintiff points out that the Supreme Court stated in Dalton that the defendant, although not a fiduciary, was "bound to act in good faith and with due regard to the interests of" his employer. Similarly, Plaintiff argues that it "placed its trust and confidence in [Mr.] Lanier and that [he] used that trust, confidence and resulting power to dominate [Plaintiff] and [Plaintiff's] other employees and, surreptitiously, from the inside, stole away the very business he was supposed to service and safeguard for [Plaintiff]." However, the record contains no evidence tending to show that Mr. Lanier had any responsibility, beyond the adequate performance of his job duties, for safeguarding Timken's decision to contract with Plaintiff, instead of some other entity, for the provision of construction-related maintenance services at the Asheboro plant. As a result, we do not believe that Plaintiff's argument in reliance upon Dalton has any merit.

We have carefully examined Plaintiff's factual contentions regarding the circumstances surrounding the resignation of Mr.

Lanier and his co-workers from their employment with Plaintiff and Timken's decision to transfer construction maintenance service work from Plaintiff to Crowder and have concluded that these contentions lack adequate record support. For example, Plaintiff contends that Mr. Lanier "leveraged the trust and confidence reposed in him by [Plaintiff] to pressure both [Plaintiff's] other employees and [Mr.] Flickinger into submitting to a conspiracy with Crowder to replace [Plaintiff] with Crowder at the Timken Asheboro plant site." In addition, Plaintiff repeatedly asserts that Mr. Lanier "pressured" his co-workers and Mr. Flickinger to work with Crowder instead of Plaintiff and contends that, in order to "achieve his self-dealing goal, [Mr.] Lanier directed the crew to . . . resign *en masse* from [Plaintiff] in the middle of a critical machine move." Finally, Plaintiff contends that Mr. Lanier "filtered and provided the information that he thought would best advance his self-dealing conspiracy with Crowder to steal the Timken business."

After thoroughly reviewing the evidentiary materials that were submitted for the trial court's consideration, we find no evidence that Mr. Lanier "pressured" his crew to resign their employment with Plaintiff or to begin working for Crowder or that Plaintiff "filtered" the information that they received prior to deciding to change employers. As we have already noted, each crew member testified that, even before learning of a possible position at Crowder, they were planning to leave Plaintiff's employment. None of the crew members testified that Mr. Lanier "pressured" them into resigning their employment with Plaintiff; in fact, the record is completely devoid of any evidence that Mr. Lanier suggested that the members of the crew should work for Crowder rather than Plaintiff. Similarly, there is no evidence that Mr. Lanier concealed or "filtered" information in order to "pressure" his crew into leaving Plaintiff's employment. Although the record does reflect that Tracy Moore sent copies of Crowder's benefits package to Mr. Lanier for delivery to the members of the crew and subsequently met with the crew to answer any questions they might have, nothing in the record reflects that Mr. Lanier did anything to put pressure on his fellow crew members to leave their employment with Plaintiff and to begin working with Crowder.

Similarly, we find no indication that Mr. Lanier "pressured" Mr. Flickinger into using Crowder rather than Plaintiff for the purpose of providing construction-related maintenance services at the Asheboro plant. Mr. Flickinger testified that he had worked with Mr. Lanier for over ten years, that "[Mr. Lanier's] work is always top-notch," and

that, "[p]ersonally[,] I think he's [] very honest[.]" During the four months that Mr. Lanier worked for Plaintiff at Timken's Asheboro plant, he and his crew did a good job and were "very conscientious" about safety regulations. After the crew began to have problems with Plaintiff, Mr. Flickinger consulted with Timken's management about changing construction-related maintenance providers and learned that he had no contractual obligation to continue using Plaintiff's services. When Mr. Lanier spoke with Mr. Flickinger about the possibility that Crowder would assume responsibility for performing construction-related maintenance work at the Asheboro plant, Mr. Flickinger indicated that he was open to a proposal from Crowder. In fact, Mr. Flickinger testified that he intended to continue working with Mr. Lanier's crew regardless of whether they were employed by Plaintiff, Crowder, or some other company. Simply put, nothing in the present record in any way tends to show that Mr. Flickinger's preference for working with Mr. Lanier's crew had any source other than his satisfaction with the quality of their work.

In addition, although Plaintiff argues that the crew timed its resignation from Plaintiff's employment in such a way as to force Mr. Flickinger's hand "by scheduling the . . . crew's *en masse* resignation in the middle of a planned critical machine move," the record simply does not support this assertion. Instead, the undisputed evidence in the record indicates that Mr. Lanier's crew worked several hours overtime on 14 October 2010 for the sole purpose of preventing any production delays in the event that the crew was unable to return to the Asheboro plant on the following Monday as employees of Crowder. In essence, Mr. Flickinger testified that, when Mr. Lanier left on 14 October 2010, the work being done on the machine had reached "a point it would be operational so if no one was there Monday . . . we could continue operations;" that the crew "finished the work that the mechanical contractor would have needed to that day, so if no one showed up Monday, we could have continued to work with our associates and made product;" and that, when the members of the crew resigned from Plaintiff's employment, their part in the machine move was essentially "complete." Similarly, Mr. Lanier testified that the crew worked on 14 October 2010 in order to "get that machine back where somebody could finish it if something happened." As a result, we conclude that there is no record support for Plaintiff's contention that Mr. Flickinger was forced to stop using Plaintiff for the provision of construction maintenance services

based upon pressure from Mr. Lanier, the timing of the crew's resignation, or any other similar factor.[3]

Plaintiff also asserts that Mr. Lanier acted "secretly" and that he "secretly recruited the entire work force and betrayed [Plaintiff] in persuading [Mr.] Flickinger to switch to the company that best suited him, to the detriment of [Plaintiff]." A careful examination of the record reveals no indication that Mr. Lanier or his crew made any effort to hide their dissatisfaction with Plaintiff. Mr. Lanier discussed the crew's complaints with Mr. Flickinger, who testified that, every time Mr. Richardson visited the plant, "[he] would tell him, the guys aren't happy, you need to try to help[.]" In addition, the record reflects that Mr. Rice met with Mr. Lanier in mid-August 2010 and, at Mr. Lanier's request, informed Plaintiff of the crew's dissatisfaction. On 23 August 2010, Mr. Rice sent Mr. Richardson an email that specifically informed him that Mr. Lanier was "looking at other contactors. to work for in the Timken Asheboro plant, and right now the only thing stalling the change is which company will offer the best pay and benefits." The fact that Mr. Richardson claims not to have noticed this portion of the email does not in any way detract from the fact that it was sent. As a result, the record contains no indication that Mr. Lanier acted secretly.

In addition, such an allegation, even if proven, would not necessarily constitute evidence of wrongdoing. Plaintiff has not cited any authority tending to suggest that Mr. Lanier had an obligation to keep Plaintiff apprised of his desire to quit, his discussions with co-workers about changing jobs, or his negotiations with Crowder. "In North Carolina, 'in the absence of an employment contract for a definite period, both employer and employee are generally free to terminate their association at any time and without any reason.'" *Elliott v. Enka-Candler Fire and Rescue*, ___ N.C. App ___, ___, 713 S.E.2d 132, 135 (2011) (quoting *Salt v. Applied Analytical, Inc.*, 104 N.C. App. 652, 655, 412 S.E.2d 97, 99 (1991), *cert. denied*, 331 N.C. 119, 415 S.E.2d 200 (1992)) (other citations omitted). As the Supreme Court has recognized, "[t]o restrict an employer's right to entice employees, bound only by terminable at will contracts, from their positions with a competitor or to restrict where those employees may be put to work once they accept new employment savors strongly of oppression." *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 222-23, 367 S.E.2d 647, 651, *rehearing denied*, 322 N.C. 486, 370 S.E.2d 227

---

3. Mr. Richardson testified that he had no personal knowledge of the status of the machine move as of 14 October 2010.

(1988) (citation omitted). As a result, for all of these reasons, we conclude that the trial court did not err by granting summary judgment in favor of Mr. Lanier with respect to Plaintiff's breach of fiduciary duty claim.

## C. Tortious Interference with Contract

**[2]** Secondly, Plaintiff argues that the trial court erred by granting summary judgment in favor of Defendants with respect to Plaintiff's tortious interference with contract claim. In support of this contention, Plaintiff contends that the record reflects the existence of a genuine issue of fact concerning the extent to which "Defendants conspired to pressure [Mr.] Flickinger not to perform the MSA with Austin and to hire Crowder instead" and to which "Defendants acted without justification." Once again, we conclude that Plaintiff's arguments lack merit.

"The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff." *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674 84 S.E. 2d 176, 182-83 (1954)). A careful study of the record compels the conclusion that Plaintiff has failed to forecast evidence tending to show the existence of the first element required to establish a tortious interference with contract claim.

As we have already noted, the MSA sets out the terms and conditions under which Plaintiff and Timken agreed to do business. "It is common practice for companies and contractors to enter into master service agreements, the specific terms of which govern future work performed by the contractor pursuant to individual work orders or authorizations." *John E. Graham & Sons v. Brewer (In re John E. Graham & Sons)*, 210 F.3d 333, 341, *rehearing denied*, 2000 U.S. App. LEXIS 15071 (5th Cir. La. May 22, 2000). "Typically, they first sign a 'blanket contract' that may remain in place for an extended period of time. Later, they issue work orders for the performance of specific work, which usually incorporate[] the terms of the blanket contract." *Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 n.6 (5th Cir. La. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 3386, 177 L. Ed. 2d 302 (2010). "A master service agreement contemplates as

yet unspecified and wholly contingent performance in the future. The agreement standing alone obligates neither party to perform any services. The issuance of a specific work order triggers the obligation to perform." *Burnham v. Sun Oil Co.*, 618 F. Supp. 782, 785-86 (W.D. La. 1985).

Consistently with the pattern outlined above, the MSA defines Timken as the "Buyer" and Plaintiff (standing in Sanders Brothers' shoes) as the "Contractor," provides for a seven year term, and defines a "Purchase Order" as the "document or electronic notification through which Service(s) and/or Merchandise shall be requested by Buyer." The MSA "shall be incorporated into and made a part of each Buyer's Purchase Order issued to Contractor, whether or not expressly incorporated by reference in the Purchase Order," and, "together with . . . Purchase Order(s) . . . and other documents specifically incorporated by reference . . . [,] comprise the entire agreement between the parties." The MSA does not include an agreement by Timken or Plaintiff to enter into any particular number of contracts for the provision of construction-related maintenance services; instead, the MSA expressly states that "Contractor acknowledges that this Agreement is not a commitment by Buyer to purchase any Service(s) and/or Merchandise from Contractor on an exclusive basis or otherwise." As a result, we conclude that the MSA does not obligate Timken to enter into any Purchase Orders with Plaintiff, a fact which requires a finding that Timken's decision to award specific construction-related maintenance service contracts to Crowder did not breach the MSA.

In seeking to persuade us that the record did, in fact, reflect the existence of a genuine issue of material fact with respect to this issue, Plaintiff relies solely on Mr. Richardson's testimony concerning the existence of "verbal agreements" that were allegedly entered into outside the scope of the MSA. The principal problem with this argument is that the MSA contains a merger clause which clearly provides that the MSA, taken in conjunction with other pertinent written documents, constitutes the entire agreement between the parties. In addition, Plaintiff directs our attention to Mr. Richardson's belief that the provision to the effect that the MSA "is not a commitment by Buyer to purchase any Service(s) and/or Merchandise from Contractor on an exclusive basis or otherwise" should be understood to mean that Timken was obligated to contract with Plaintiff for the provision of construction-related maintenance services while retaining the ability to employ specialty contractors as necessary. This "interpretation"

is, however, contrary to the literal language of the relevant MSA provision, so we decline to adopt it.

In addition, Plaintiff disputes Defendants' contention that the MSA does not require Timken to obtain construction-related maintenance services exclusively from Plaintiff. This aspect of Plaintiff's argument rests upon Article 36 of the MSA, which states that "[t]he Contractor agrees to supply the listed Services and/or Merchandise to all Buyers, and Buyer's subsidiaries' facilities, including but not limited to" Timken bearing and alloy steel plants located in certain specified states. This provision, which simply specifies the geographical scope of the agreement, does not operate to override the remainder of the agreement, which clearly requires separate Purchase Orders in the event that Timken wished Plaintiff to perform any specific service. Moreover, although Article 36 obligates Plaintiff to supply construction-related maintenance services to a list of locations, it does not obligate Timken to contract for these services at any of those locations. Thus, this aspect of Plaintiff's argument fails as well.

As a result, in light of our review of the MSA, we conclude that (1) the MSA does not require Timken to contract with Plaintiff for provision of construction maintenance services, either at its Asheboro plant or elsewhere; (2) the MSA does not confer any specific contractual rights upon Plaintiff until Timken and Plaintiff executed a Purchase Order which required Plaintiff to provide specific construction maintenance services;[4] and (3), as Mr. Richardson conceded during his deposition, Timken did not breach the MSA by beginning to use Crowder, rather than Plaintiff, to perform construction maintenance services at Timken's Asheboro plant. As a result, given that the MSA conferred no contractual rights on Plaintiff until the execution of a specific Purchase Order and given that Plaintiff failed to adduce any evidence that Timken failed to perform any of its obligations under the MSA, we conclude that Plaintiff failed to produce evidence that the MSA "confers upon the plaintiff a contractual right against a third person." *United Laboratories*, 322 N.C. at 661, 370 S.E.2d at 387. Thus, the trial court did not err by granting summary judgment in favor of Defendants with respect to Plaintiff's tortious interference with contract claim.

---

4. Plaintiff does not assert that Timken violated any specific Purchase Order as a result of Defendants' conduct. Instead, Plaintiff's tortious interference claim relies solely on alleged violations of the MSA.

## D.  Unfair or Deceptive Trade Practices

**[3]**  Thirdly, Plaintiff argues that the trial court erred by granting summary judgment in favor of Defendants with respect to its unfair or deceptive trade practices claim. In support of this contention, Plaintiff argues that Defendants "interrupted the commercial relationship between Austin and Timken," that "their actions of hiring away the entire work force and inducing non-performance of the Austin/Timken MSA by Timken" constituted unfair and deceptive trade practices, and that Mr. Lanier "surreptitiously raided the entire Austin workforce to his and Crowder's benefit and to the clear detriment of Austin." We do not find Plaintiff's arguments persuasive.

"The extent of trade practices deemed as unfair and deceptive is summarized in [N.C. Gen. Stat.] § 75-1.1(a) ('the Act'), which . . . was intended to benefit consumers[.] . . . [T]he Act does not normally extend to run-of-the-mill employment disputes[, unless] . . . an employee's conduct: (1) involved egregious activities outside the scope of his assigned employment duties, and (2) otherwise qualified as unfair or deceptive practices that were in or affecting commerce." *Dalton*, 353 N.C. at 655-56, 548 S.E.2d at 710-11 (citing *Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 469, 343 S.E.2d 174, 179 (1986), *HAJMM Co.*, 328 N.C. at 593, 403 S.E.2d at 492, and *Sara Lee*, 351 N.C. at 34, 519 S.E.2d at 312). For example, in *Dalton*, 353 N.C. at 658, 548 S.E.2d at 712, in which the defendant formed a company for the purpose of competing with his employer before resigning and then obtaining the contract previously held by his employer, the Supreme Court held:

> That [the defendant] failed to inform his employer of the ongoing negotiations and resigned after signing the KFI deal may be an unfortunate circumstance; however, in our view, such business-related conduct, without more, is neither unlawful in itself. . . . nor aggravating or egregious enough to overcome the longstanding presumption against unfair and deceptive practices claims as between employers and employees.

Similarly, in this case, the undisputed evidence showed that (1) by July or August, 2010, before they were provided with information concerning Crowder, Mr. Lanier and the crew working with him had each made the independent decision to look for a new employer; (2) Mr. Lanier discussed the crew's complaints with Mr. Flickinger and

Mr. Richardson; (3) at Mr. Lanier's request, Mr. Rice informed Mr. Richardson that the crew was looking for a company to replace Plaintiff at Timken's Asheboro plant; and (4) the crew decided to work for Crowder despite a reduction in the level of their employer-provided benefits. As a result, we conclude that the record fails to support Plaintiff's assertion that Defendants "surreptitiously raided" Plaintiff's workforce and that neither the decision by Mr. Lanier and his crew members to become Crowder employees nor the manner in which Crowder obtained the right to perform construction-related maintenance work previously performed by Plaintiff supported a finding of liability under N.C. Gen. Stat. § 75-1.1.

In urging us to reach a contrary result, Plaintiff cites *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 620 S.E.2d 222 (2005), *disc. review dismissed*, 360 N.C. 296, 629 S.E.2d 289 (2006). According to Plaintiff, *Sunbelt* "expressly prohibits as an unfair trade practice the surreptitious and intentional use of employees to solicit other employees while both the soliciting and solicited employees are still employed by the same company." Aside from the fact that we do not read *Sunbelt* as enunciating a *per se* rule of the nature described by Plaintiff and the fact that *Sunbelt* is readily distinguishable from this case on a factual basis, the record does not contain any evidence tending to show that Defendants engaged in "the surreptitious and intentional use of employees to solicit other employees."

In *Sunbelt*, the president and other key executives of a corporation resigned in order to work for a competitor. Subsequently, they secretly recruited more than seventy key managerial employees at various locations to join them. The result of this series of activities was that the plaintiff's "branches were severely impacted, or 'crippled,' to the point [that the plaintiff's] opportunity and ability to compete for key employees on a level playing field was completely eliminated." *Sunbelt*, 174 N.C. App at 51, 60, 620 S.E.2d at 225, 230. In addition, the defendants misappropriated trade secrets by sharing certain confidential information with this competitor. On the other hand, in this case a four-man work crew, all of whom were at-will employees responsible for performing construction-related maintenance services, became dissatisfied with Plaintiff and left to work for a different company. Aside from the fact that the resignation of these four men from an organization employing over 7,000 employees differs dramatically from the situation at issue in *Sunbelt*, the record does not establish that the events in question involved the disclosure

of confidential information, had significant impact on Plaintiff's financial situation, or caused damage to Plaintiff's competitive position. Thus, we do not believe that *Sunbelt* has any significant bearing on the proper resolution of this case.

In addition, Plaintiff cites *Songwooyarn Trading Co. v. Sox Eleven*, ___ N.C. App ___, 714 S.E.2d 162, *disc. review denied*, 365 N.C. 360, 718 S.E.2d 396 (2011), in support of its attempt to establish the validity of its unfair or deceptive trade practices claim. In *Songwooyarn*, the defendant misappropriated funds belonging to his employer and secretly diverted monies that were supposed to be paid to one of his employer's corporate affiliates for his own use. On appeal, we upheld the trial court's decision to direct a verdict in favor of the plaintiff with respect to its unfair and deceptive trade practices claim. *Songwooyarn* is easily distinguished from the facts of the present case and does not control its outcome.

Although Plaintiff's unfair and deceptive trade practices claim rests on allegations that Defendants "secretly pressured" Plaintiff's employees to change jobs, thereby "induc[ing]" Timken to breach the MSA, the record does not, as we have already demonstrated, support these assertions. As a result, none of the arguments upon which Plaintiff relies in challenging the trial court's decision to grant summary judgment in Defendants' favor with respect to Plaintiff's unfair and deceptive trade practices claim have merit.

### E.  Civil Conspiracy and Injunctive Relief

[4]  Finally, Plaintiff argues that the trial court erred by granting summary judgment in favor of Defendants with respect to its civil conspiracy claim and its request for injunctive relief. Plaintiff has not, however, advanced any specific arguments directed in opposition to the trial court's rulings with respect to these claims. Instead, Plaintiff simply asserts that, "[f]or the reasons discussed" in addressing its other challenges to the trial court's rulings, the trial court erred by granting summary judgment with respect to Plaintiff's civil conspiracy claim and by denying Plaintiff's request for the issuance of a permanent injunction. Having already considered and rejected these arguments, we necessarily conclude that the trial court did not err by granting summary judgment in Defendants' favor with respect to Plaintiff's civil conspiracy claim and rejecting its request for injunctive relief.

III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court did not err by entering orders granting summary judgment in favor of Defendants and denying Plaintiff's request for the issuance of a permanent injunction. As a result, the trial court's orders should be, and hereby are, affirmed.

AFFIRMED.

Judges McGEE and STEELMAN concur.