**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten days**
**of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 3, 2016**

# In the Court of Appeals of Georgia

A16A0984. RIGBY et al. v. FLUE-CURED TOBACCO COOPERATIVE STABILIZATION CORPORATION.

RICKMAN, Judge.

In a second appearance before this Court, Julian Rigby, Terry Altman, Elton Carter, David H. Lee, and Bryan Aldridge appeal the trial court's order granting summary judgment to the Flue-Cured Tobacco Cooperative Stabilization Corporation on their claims for breach of fiduciary duty and attorney fees and expenses.[1] Appellants contend that the trial court erred by (1) applying Georgia law to their breach of fiduciary duty claim, (2) finding that the evidence was insufficient to support their breach of fiduciary duty claim under North Carolina law, (3) determining that their

---

[1] The first appeal in this case was *Rigby v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 327 Ga. App. 29 (755 SE2d 915) (2014). Byron Carter was a party to the prior appeal, but his claims were dismissed with his consent prior to this appeal.

breach of fiduciary claim is barred by the statute of limitations, and (4) granting judgment against them on their claim for attorney fees and expenses under OCGA § 13-6-11. For reasons that follow, we affirm.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (Citation, footnote, and punctuation omitted.) *Burkett v. Liberty Mut. Fire Ins. Co.*, 278 Ga. App. 681, 681-682 (629 SE2d 558) (2006).

So viewed, the evidence shows that the Flue-Cured Tobacco Cooperative Stabilization Corporation, now known as the U. S. Tobacco Cooperative Inc. (the "Cooperative"), was formed in North Carolina in 1946 as a non-profit cooperative association with the stated purposes of engaging in any activity "involving or relating to the business of receiving, grading, processing, drying, packing, storing, financing, marketing, selling, and/or distribution, on a cooperative basis, of flue-cured tobacco or products or by-products derived therefrom. . . ." Appellants are current or former

2

tobacco farmers who were members of the Cooperative by virtue of their payment of a $5 capital contribution in exchange for a share of common stock. The Cooperative's Articles of Incorporation provide that the common stock "may be purchased, owned or held only by producers who shall patronize the corporation in accordance with uniform terms and conditions prescribed thereby and only such persons shall be regarded as eligible members of the [Cooperative]."

Additional facts are taken from the prior opinion in this case:

> The [Cooperative] worked through the Commodity Credit Corporation ("CCC") and the United States Department of Agriculture ("USDA") to administer the federal tobacco price support program within the framework first created by the Agricultural Adjustment Act of 1938, which established a program of federal tobacco quotas and price supports aimed at stabilizing and increasing the prices paid to America's tobacco growers. 7 USC §[] 1281 et seq.

> In brief, the USDA annually set the minimum price for flue-cured tobacco, and the payment for tobacco was funded through loans that the [Cooperative] received from the CCC. The [Cooperative] used the loans to purchase eligible tobacco that served as collateral for the CCC loans. The [Cooperative] then processed and stored the tobacco, and later attempted to resell it at a price sufficient to repay or reduce the CCC loans. When the [Cooperative] realized more from the sale of a particular tobacco crop than necessary to repay the CCC loans and recover its costs, the tobacco growers who produced that particular crop received a portion

3

of the surplus, or net gain. When the proceeds from the sale of a particular crop were insufficient to repay the CCC loans, however, the losses were absorbed by the federal government.

In 1982, Congress [adopted the No Net Cost Tobacco Program Act, PL 97-218, 96 Stat. 197, to ensure that the tobacco price support program was carried out at no net cost to the taxpayer by requiring producers of quota tobacco to share equitably in helping to eliminate losses that may be incurred in carrying out the program] and requiring any net gains realized by tobacco cooperatives to be retained by the CCC in order to offset any losses incurred on tobacco loans. . . . In 2004, the federal government ended the minimum price support program with passage of the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA").

*Rigby v. Flue-Cured Tobacco Coop. Stabilization Corp.*, 327 Ga. App. 29, 30-31 (755 SE2d 915) (2014).

In 2004, the Cooperative purchased a processing and manufacturing facility to enable it to manufacture cigarettes and develop brands to be distributed by a third party. Later that year, the Cooperative sent letters to flue-cured tobacco farmers, informing them of this new venture and offering them the opportunity to sign an exclusive marketing agreement with the Cooperative for the 2005 crop year. Farmers

who elected not to enter exclusive marketing agreements were no longer considered eligible members and were given the opportunity to have their stock redeemed.

In 2007, Appellants filed suit against the Cooperative, asserting claims for an accounting, distribution of retained earnings, specific performance to compel issuance of stock certificates, breach of contract based on an alleged denial of the right to sell tobacco through the Cooperative's marketing centers, and attorney fees. Appellants amended their complaint several times, adding claims for breach of contract/conversion for failure to pay their share of gains on the sale of tobacco from 1967-1973, breach of a loan warranty to pay net proceeds on the sale of tobacco from 1967-1973, and breach of fiduciary duty (added in 2012). The trial court ultimately dismissed or granted summary judgment to the Cooperative on all claims, and Appellants appealed.

In *Rigby*, 327 Ga. App. 29, a panel of this Court affirmed the trial court's ruling on all claims except the trial court's dismissal of the breach of fiduciary claim and the grant of summary judgment on the related claim for attorney fees and expenses. Specifically, this Court held that "we cannot conclude that some of the [Appellants] could not establish a fiduciary relationship in this case" under North Carolina law, id.

5

at 41 (6), and that Appellants "might be entitled to attorney fees with respect to their breach of fiduciary duty claim." Id. at 42 (7).

After that decision, the case returned to the trial court and the parties conducted additional discovery on the breach of fiduciary duty claim, which consists of the following alleged violations: wrongfully attempting to remove Appellants as members of the Cooperative; failing to provide the Appellants with contracts; withholding discovery and refusing to allow Appellants to inspect the Cooperative's books; failing to set up capital reserve accounts for each Appellant; holding net gains past the next tax year; not allowing Appellants to inspect the corporate minutes; not issuing stock certificates; not keeping a stock book; failing to pay Appellants as required; and taking disadvantageous bids for tobacco sold through the Cooperative. The Cooperative then filed a motion for summary judgment, which the trial court granted. The trial court ruled that, applying the doctrine of lex loci delicti, Georgia law governed Appellants' claim for breach of fiduciary duty and that Georgia law foreclosed their claim. The trial court also ruled that if North Carolina law applied, it would foreclose Appellants' claim because the Cooperative owed no fiduciary duty to Appellants. In addition, the trial court ruled that the claim was barred by the Georgia statute of limitations. Finally,

6

the trial court ruled that the related claim for attorney fees must fail because it was predicated on the underlying breach of fiduciary duty claim.

1. *Breach of fiduciary duty claim.*

Appellants contend that the trial court erred in ruling that (1) Georgia law applies to their breach of fiduciary duty claim, and (2) even if North Carolina law applies, it forecloses their breach of fiduciary duty claim. They argue that North Carolina law applies and that "there is sufficient evidence to create a question of fact as to whether [the Cooperative] used Appellants' funds to serve its own interests and to the detriment of these farmers by purging them from the membership rosters and refusing them the opportunity to sell tobacco." Appellants also argue that their breach of fiduciary duty claim is timely because it relates back to the filing of their original complaint.

The trial court ruled that Georgia law should apply to Appellants' breach of fiduciary duty claim under the doctrine of lex loci delicti because the injuries to the Appellants, all Georgia residents, were suffered in Georgia. See *Bullard v. MRA Holding, LLC*, 292 Ga. 748, 750 (1) (740 SE2d 622) (2013) (Georgia follows the doctrine of lex loci delicti in tort cases, "pursuant to which a tort action is governed by the substantive law of the state where the tort was committed," and "[t]he place where the tort was committed, or, the locus delicti, is the place where the injury sustained was

7

suffered rather than the place where the act was committed.") (citations and punctuation omitted). Appellants do not challenge the trial court's ruling that Georgia law forecloses their breach of fiduciary duty claim, but instead argue that North Carolina law should apply under the internal affairs doctrine, codified in OCGA § 14-2-1505 (c) ("This chapter does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."), and that under North Carolina law, whether a fiduciary relationship exists is a question of fact for the jury. Even if we assume that North Carolina law applies to Appellants' breach of fiduciary duty claim, we conclude that summary judgment was properly granted.

Under North Carolina law, to establish a claim for breach of fiduciary duty, "there must first be a fiduciary relationship between the parties." (Citations omitted.) *Dalton v. Camp*, 353 N. C. 647, 651 (I) (548 SE2d 704) (2001). "[A] fiduciary relationship is generally described as arising when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." (Citations and punctuation omitted.) *Dallaire v. Bank of Am., N.A.*, 367 N. C. 363, 367 (760 SE2d 263) (2014). In North Carolina, there are two types of fiduciary relationships: (1) those

8

that arise as a matter of law from the nature of the relationship, such as attorney and client, trustee and trust beneficiary, principal and agent; and (2) those that arise in fact, "in which there is confidence reposed on one side, and the resulting superiority and influence on the other." (Citations and punctuation omitted.) *Ellison v. Alexander*, 207 N. C. App. 401, 408 (1) (b) (700 SE2d 102) (2010); see also *Commscope Credit Union v. Butler & Burke, LLP*, ___ N. C. ___ (II) (790 SE2d 657) (2016); *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N. C. 578, 588 (403 SE2d 483) (1991) (although business partners are fiduciaries as a matter of law, in less clearly defined situations, "the question whether a fiduciary relationship exists is more open and depends ultimately on the circumstances").

Here, Appellants contend that a fiduciary relationship arose because they held a "special confidence" in the Cooperative as their sole outlet for selling their tobacco crops for years. Appellants provide no citation to the record to support this contention and our review of the existing record has yielded no such support.

Rigby testified in his deposition that he never trusted the Cooperative and only sold a portion of his tobacco to the Cooperative while he was a member. Beginning in 1984, Rigby also ran a tobacco warehouse and sometimes competed with the Cooperative to buy tobacco for resale. Carter testified in his deposition that he never

spoke to a board member or other representative of the Cooperative when he was a member and placed no special trust in the Cooperative. He further testified that his claim is based on the government's reduction of his quota or the amount of tobacco he was allowed to produce in the late 1970s or early 1980s and that he does not know what claim he has against the Cooperative. Lee testified in his deposition that he sold tobacco outside of the tobacco program, that he would sell it to another buyer if they were offering more than the Cooperative, that he felt no particular loyalty to the Cooperative, that he sold approximately 20-25% of his tobacco to the Cooperative before the price support program ended, and that he did not pursue an exclusive contract with the Cooperative in 2005 because he decided to stay with Philip Morris. In his deposition, Aldridge testified that he never met anyone from the Cooperative and did not trust the Cooperative. Aldridge testified at one point that he sold tobacco to the Cooperative and to other companies, but later testified that he sold his tobacco to Rigby through Rigby's warehouse and does not know who bought it after that, whether it was the Cooperative or a tobacco company. Altman testified in his deposition that he did trust the Cooperative because it provided a place for their tobacco to be resold, but he never communicated or interacted with any board

10

members or representatives of the Cooperative and he placed no special confidence in the Cooperative to do anything specifically for him.

The evidence in the existing record does not show that Appellants have reposed any "special confidence" in the Cooperative that would rise to the level necessary to impose fiduciary duties on the Cooperative. Accordingly, we conclude that summary judgment was properly granted on Appellants' breach of fiduciary duty claim. *See* *Dallaire*, 367 N. C. at 368 ("record provides no basis for concluding that [appellants] reposed in the . . . loan officer the special confidence required for a fiduciary relationship"); *see also* *Dalton*, 353 N. C. at 652 (I) (trial court properly granted summary judgment on breach of fiduciary duty claim where evidence did not show one of essential components of any fiduciary relationship); *Austin Maintenance & Constr., Inc. v. Crowder Constr. Co.*, 224 N. C. App. 401, 409-412 (II) (B) (742 SE2d 535) (2012) (fiduciary relationship between foreman and crew member only possible if crew member "reposed trust and confidence in [foreman], resulting in a situation in which [foreman] exercised 'superiority and influence' over [crew member]," and evidence did not demonstrate such a relationship).[2]

---

[2] Given our determination that summary judgment was properly granted to the Cooperative on Appellants' breach of fiduciary duty claim, we need not address the statute of limitations issue.

2. *Attorney fees and expenses claim.*

Appellants contend that the trial court erred by granting summary judgment on their claim for attorney fees and expenses under OCGA § 13-6-11. But "[a] prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim." *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 146 (2) (475 SE2d 601) (1996); see also *Quantum Trading Corp. v. Forum Realty Corp.*, 278 Ga. App. 485, 490 (2) (629 SE2d 420) (2006) ("party may not recover litigation expenses and attorney fees under [OCGA § 13-6-11] unless he or she recovers damages on a substantive claim") (footnote omitted). Because Appellants did not prevail on their only remaining claim, summary judgment was properly granted on their claim for attorney fees and expenses under OCGA § 13-6-11.

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur.*