Atkore Int'l, Inc. v. Dinkheller, 2025 NCBC 20.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

ATKORE INTERNATIONAL, INC.,

Plaintiff,

v.

KEITH D. DINKHELLER and
NATIONAL PIPE & PLASTICS, INC.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV022644-400

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT
[Public]**[1]

1.     **THIS MATTER** is before the Court following the 16 December 2024 filing of *Defendants' Motion to Dismiss Plaintiff's First Amended Complaint* (the Motion). (ECF No. 55 [Mot.].)  Pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the Rule(s)), Defendants Keith D. Dinkheller (Dinkheller) and National Pipe & Plastics, Inc. (National Pipe; and with Dinkheller, Defendants) seek to dismiss all claims asserted against them by Plaintiff Atkore International, Inc. (Atkore) in the Amended Complaint, (ECF No. 33 [Am. Compl.]).  (Mot. 1.)

2.     For the reasons set forth herein, the Court hereby **GRANTS** in part and **DENIES** in part the Motion.

---

[1] Recognizing that this Order and Opinion cites to and discusses the subject matter of documents that the Court has temporarily allowed to remain under seal in this action, the Court initially filed this Order and Opinion under seal on 2 April 2025, (*see* ECF No. 94), and requested that the parties advise the Court whether any portions of the Order and Opinion deserved to remain under seal. On 10 April 2025, the parties notified the Court that all parties conferred and agreed that there is no material in this Order and Opinion that requires sealing. Accordingly, the Court now files this public version of the Order and Opinion and will promptly unseal the previously filed version, (ECF No. 94).  The Court requests that the Guilford County Clerk of Court unseal the document previously filed under seal on Odyssey, (24CV022644-400, at Event No. 44).

*Miller Monroe & Plyer, PLLC by Jason A. Miller and John W. Holton, and Foley & Lardner, LLP by Taylor L. Appling and Donald Schroeder for Plaintiff.*

*Littler Mendelson, P.C. by Kevin Cleys, Kellie A. Tabor, Stephen D. Dellinger for Defendants.*

Robinson, Chief Judge.

## I.  INTRODUCTION

3.  This action arises out of Dinkheller's employment at Atkore.  Atkore initiated this action contending that Dinkheller left Atkore for a competitor, National Pipe, in violation of his employment agreement and the restrictive covenants found therein, taking with him to National Pipe trade secret information.  Atkore also contends National Pipe wrongfully interfered with Dinkheller's employment agreement by inducing him to breach the restrictive covenants found therein.

## II.  FACTUAL BACKGROUND

4.  The Court does not make findings of fact on a motion to dismiss pursuant to Rule 12(b)(6), but instead recites only those factual allegations included in the Amended Complaint that are relevant to the Court's determination of the Motion.

### A.  <u>The Parties</u>

5.  Atkore is a corporation with its principal place of business in Illinois that is authorized to do business in North Carolina.  (Am. Compl. ¶ 7.)  Atkore is a "leading global manufacturer and distributor of electrical, safety, and infrastructure solutions[,]" and "manufactures electrical conduit and fittings, among other products."  (Am. Compl. ¶ 13.)

6.  Dinkheller is a resident and citizen of North Carolina.  (Am. Compl. ¶ 8.)

7. National Pipe is a Delaware corporation that is authorized to do business in North Carolina. (Am. Compl. ¶ 9.) National Pipe "manufactures and sells infrastructure products in the energy, water, and telecommunications spaces." (Am. Compl. ¶ 65.)

**B.    Dinkheller's Work at Atkore**

8. Atkore's business has "three key product categories: (1) Plastic Pipe, Conduit and Fittings; (2) Metal Electrical Conduit & Fittings; and (3) Electrical Cable & Flexible Conduit." (Am. Compl. ¶ 14.) Plastic Pipe, Conduit and Fittings is Atkore's largest product category, accounting for over one-third of Atkore's net sales. (Am. Compl. ¶ 15.) Additionally, a major initiative of Atkore's for the last two years has been "expansion into the market of PVC water pipe manufacturing." (Am. Compl. ¶ 16.)

9. Dinkheller began working at Atkore in 2013 as the Manager of Production Control in Utah. (Am. Compl. ¶ 41.) He has held many positions at Atkore, including Production Manager in Utah, Plant Manager in New York, and Plant Manager in Oregon. (Am. Compl. ¶ 41.) Thereafter, he was promoted to "Regional Director of Operations over multiple plants, with plant managers across the country reporting to him." (Am. Compl. ¶ 41.)

10. During his tenure at Atkore, Dinkheller gained many skills and insight into industry specific information. (Am. Compl. ¶ 42.) Dinkheller "had access to and performed work for Atkore facilities across the country", had "a direct line of communication with Atkore's CEO," and "access to and development of Atkore's

confidential . . . information about its manufacturing processes, strategies, materials, formulas, and equipment[.]"  (Am. Compl. ¶ 40.)

11. Dinkheller resigned from Atkore in January 2023, but shortly thereafter "asked to return to Atkore after just a few months of working in a different industry." (Am. Compl. ¶ 43.)

12. When Dinkheller returned to Atkore, "Atkore's initiative to expand its water pipe business was at the forefront of its strategic growth plan."  (Am. Compl. ¶ 44.)  Dinkheller was enlisted to help in this effort, with Atkore creating "a specialized position just for Dinkheller—the Director of Technical Program Management—with the specific purpose of having Dinkheller oversee the execution of this top-priority initiative[.]"  (Am. Compl. ¶ 44.)

13. On 20 June 2023, Dinkheller executed a Confidentiality, Non-Competition, Non-Solicitation and Proprietary Rights Agreement (the Dinkheller Agreement), which contains several obligations related to Dinkheller's renewed employment with Atkore.  (Am. Compl. ¶ 18; *see* Am. Compl. Ex. A, ECF No. 33.1 [Agt.].)

14. As to his confidentiality obligations, the Dinkheller Agreement provides that the

> Employee will at all times, both during the period while Employee is affiliated with the Company and after Employee's affiliation with the Company ends, maintain in confidence and will not, without the prior written consent of the Company, use, except in the course of performance of Employee's duties for the Company or by court order, disclose or give to others any Confidential Information. Upon the termination of Employee's affiliation with the Company, with or without Cause, or if the Company otherwise requests, (a) Employee will return to the Company all tangible Confidential Information and copies thereof (regardless how such Confidential Information or copies are

maintained), and (b) Employee will deliver to the Company any property of the Company which may be in Employee's possession, including, but not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cell phones, credit cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic format or otherwise, relating to any matter within the scope of the Company's business or concerning any of its dealings or affairs and any other Company property in Employee's possession, custody or control (whether prepared by Employee or others). The terms of this Section 7 are in addition to, and not in lieu of, any other contractual, statutory, common law, or legal obligation that Employee may have relating to the protection of the Company's Confidential Information.

(Agt. at ¶ 7.) "Confidential Information" as it is used in the Dinkheller Agreement, means

confidential and proprietary information of the Company (including its subsidiaries, parents, affiliates, successors and assigns), whether in written, oral, electronic or other form, including but not limited to, information and facts concerning business plans, marketing plans, strategies, forecasts, customers, future customers, suppliers, licensors, licensees, partners, investors, affiliates or others, training methods and materials, financial information, pricing models and methods, sales prospects, client and partner lists, inventions, tests, test results, product assessments, improvements, products, designs, methods, show-how and know-how, techniques, systems, processes, software programs, algorithms, formulae, works of authorship, code, technical data and specifications, or any other technical or trade secrets of the Company or of any third party provided to Employee or the Company; provided that, Confidential Information will not include information that is in the public domain other than through any fault or act by Employee.

(Agt. at ¶ 1.) Further, the Dinkheller Agreement states that Dinkheller's confidentiality obligations "shall survive indefinitely any termination of Employee's affiliation with the Company with or without cause." (Agt. at ¶ 7.)

15. As to his non-competition obligations, the Dinkheller Agreement provides that

During the period in which Employee is employed by or otherwise affiliated with the Company and for a period of twelve (12) months following the last day of Employee's affiliation with the Company (the "Restricted Period"), Employee will not, without the prior written consent of the Company:

    a. For Employee or on behalf of any other person or entity, directly or indirectly, either as principal, partner, stockholder, officer, director, member, employee, consultant, agent, representative or in any other capacity, provide services to or engage with any business within the Restricted Territory (as defined below) which is directly or indirectly Competitive (as defined in Section 1) with the business of the Company, to the extent such services or engagement are the same as, or substantially similar to, the services that Employee performed for the Company during the two (2) year period preceding Employee's separation from employment with the Company. Nothing contained herein will preclude Employee from purchasing or owning securities of any such business if such securities are publicly traded, and provided that Employee's holdings do not exceed one percent (1%) of the issued and outstanding securities of any class of securities of such business.

(Agt. at ¶ 2.) Pursuant to the Dinkheller Agreement, a business is "competitive" if it

performs any of the services or manufactures or sells any of the products provided or offered by the Company or if it performs any other services and/or engages in the marketing, production, manufacture, distribution or sale of any product or service similar to the services or products which were performed, produced, marketed, manufactured, distributed, sold, under development or planned by the Company during Employee's affiliation with the Company, or which could substitute for such products or services.

(Agt. at ¶ 1.) The Dinkheller Agreement also defines "Restricted Territory" as

any country, state, region, territory or geographic location in which Employee provided services to or on behalf of the Company or within which Employee had a material presence or influence for the Company, within the two (2) year period preceding Employee's separation from employment with the Company.

(Agt. at ¶ 3.b.)

16.     In his role as Director of Technical Program Management, Dinkheller was in charge of many initiatives, including but not limited to "managing the capital plan, plant builds, equipment installation, capacity growth, [and] new product development[,]" and he was "a key technical architect of Atkore's strategic plans for its water business for 2025." (Am. Compl. ¶ 45.) Dinkheller "routinely consulted with Atkore's President (Electrical), John Pregenzer, to review and update the strategic plan he was executing for Atkore." (Am. Compl. ¶ 45.) Additionally, Dinkheller was "given sole authority" to "manage and spend all of the funds allocated by Atkore for this key strategic initiative, to select and purchase all equipment needed, to direct the installation and incorporation of all equipment at the key manufacturing locations[,]" as well as other responsibilities associated with this project. (Am. Compl. ¶ 46; *see also* Am. Compl. ¶ 47.)

17.     As a result, Dinkheller knew "Atkore's entire playbook for its water pipe expansion initiative," as well as "in depth knowledge of Atkore's electrical conduit and fittings production capabilities, capital investment plan, raw material sourcing, and procurement strategy, including direct relationships with the suppliers." (Am. Compl. ¶ 48.) For example, Dinkheller "prepared a confidential PowerPoint presentation" which outlined strategies for implementing the initiatives he was overseeing, and presented this PowerPoint "to a small group of Atkore's executive leadership team to request significant expenditure for the initiative." (Am. Compl. ¶ 2.)

18. In addition to his work on the water initiative, Dinkheller also "remained heavily involved on the electrical pipe side[,]" maintaining a "national influence over the water pipe expansion initiative and the electrical pipe business, both of which are nationwide businesses for Atkore." (Am. Compl. ¶ 49.)

C. **Dinkheller's Resignation from Atkore and Related Conduct**

19. During July 2024—Dinkheller's last month of employment at Atkore—he spent a majority of his time "traveling to North Carolina and to Atkore's plant in Fort Mill, South Carolina." (Am. Compl. ¶ 50.) Dinkheller was there to help "Atkore's Fort Mill plant with its optimization by improving its productivity and output and reducing water on the electrical pipe side of the business." (Am. Compl. ¶ 50.) However, Atkore believes that Dinkheller "demonstrate[d] a lack of focus and attention[,]" and "was not giving his best efforts[.]" (Am. Compl. ¶¶ 50–51.) By way of example, Atkore alleges that Dinkheller "directed critical changes to the blending and extrusion processes at the Fort Mill, SC plant"; however, "Fort Mill's equipment was not adequate to handle the specifications of the blend that Dinkheller directed causing several mechanical breakdowns and a less effective compounding process[.]" (Am. Compl. ¶ 52.)

20. On 18 July 2024, National Pipe "posted its position for Director of Operations in Colfax, NC[,]" which was subsequently offered to Dinkheller on 26 July 2024. (Am. Compl. ¶ 53.) National Pipe's original posting for the position "stated that the salary range was $160,000 to $180,000 annually." (Am. Compl. ¶ 56.) However, Dinkheller's offer for employment was for $220,000. (Am. Compl. ¶ 56.)

21. On 2 August 2024, Dinkheller accepted National Pipe's offer, and on 8 August 2024, Dinkheller informed Atkore of his resignation. (Am. Compl. ¶ 58.) On the same day as his resignation, Atkore sent Dinkheller a letter, "reminding him of his post-employment restrictive covenants and obligations." (Am. Compl. ¶ 60.) Thereafter, on 15 August 2024, Atkore sent a letter to National Pipe, "providing them with a copy of [Dinkheller's] employment agreement containing his restrictive covenants." (Am. Compl. ¶ 61.)

22. Atkore also alleges that during the pendency of this litigation, Dinkheller disclosed to the public, through the filing of an affidavit, "the location of every single facility where Atkore's water pipe expansion initiative is taking place, the dollar amount of the capital expenditure, and the identity of certain products and models included." (Am. Compl. ¶ 4.)

## III. PROCEDURAL HISTORY

23. On 11 October 2024, this action was initiated with the filing of the Verified Complaint. (ECF No. 3.) Thereafter, on 15 November 2024, Atkore filed its Amended Complaint—the operative pleading—asserting six claims: (1) breach of contract against Dinkheller related to the non-competition provision within the Dinkheller Agreement (Count One), (Am. Compl. ¶¶ 69–77); (2) tortious interference with contract against National Pipe (Count Two), (Am. Compl. ¶¶ 78–90); (3) breach of fiduciary duties against Dinkheller (Count Three), (Am. Compl. ¶¶ 91–100); (4) constructive fraud against Dinkheller (Count Four), (Am. Compl. ¶¶ 101–06); (5) unfair and deceptive trade practices against Defendants (Count Five), (Am.

Compl. ¶¶ 107–10); and (6) misappropriation of trade secrets against Defendants (Count Six); (Am. Compl. ¶¶ 111–24).

24.    Thereafter, the Motion was filed, and following complete briefing, the Court held a hearing on 11 March 2025 (the Hearing), where all parties were represented through counsel. (*See* ECF No. 89.) The Motion is ripe for determination.

## IV.    LEGAL STANDARD

25.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the Amended Complaint in the light most favorable to Atkore. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the Complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (citation omitted).

26.    Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the Complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citation omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment.

*Id.* (citation omitted). Moreover, the Court "may properly consider documents which are the subject of the Complaint and to which the Complaint specifically refers even though they are presented by the Defendants." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citation omitted).

27. Our Supreme Court has observed that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the Complaint on its face reveals that no law supports the Plaintiff's claim; (2) the Complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the Complaint discloses some fact that necessarily defeats the Plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) motions is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of a Complaint in the context of complex commercial litigation." *Id.* at 615 n.7 (citations omitted).

## V.   ANALYSIS

28. Defendants have moved to dismiss each claim asserted against them, and the Court addresses each claim in turn.

### A.   Count One: Breach of Contract Against Dinkheller

29. Atkore asserts Count One against Dinkheller for breach of the Dinkheller Agreement, alleging that the Dinkheller Agreement is a "valid and enforceable non-compete agreement," (Am. Compl. 70), and Dinkheller breached such agreement when he "began working for National Pipe, a competitor of Atkore, within 12 months following the termination of his employer with Atkore," (Am. Compl. ¶ 74).

30.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000).  When these elements are alleged, "it is error to dismiss a breach of contract claim under Rule 12(b)(6)," and our appellate courts routinely reverse trial court orders that require anything more.  *Woolard v. Davenport*, 166 N.C. App. 129, 134 (2004).  "[S]tating a claim for breach of contract is a relatively low bar."  *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019).

31.     As an initial matter, non-compete covenants are "not viewed favorably in modern law."  *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004) (citation omitted).  In determining whether a non-compete agreement is, in fact, reasonable, valid, and enforceable, courts must examine the "reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests."  *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 86 (2007).

32.     As this Court has explained,

> [t]o be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer. If a non-compete covenant is too broad to be a reasonable protection to the employer's business it will not be enforced.  The courts will not rewrite a contract if it is too broad but will simply not enforce it.

*PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *17–18 (N.C. Super. Ct. Sept. 9, 2020) (quoting *VisionAIR*, 167 N.C. App. at 508).  "The

reasonableness of a non-competition covenant is a matter of law for the court to decide." *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655 (2009).

33. Based on these principles, the North Carolina Court of Appeals has declined to enforce non-compete covenants prohibiting employees from directly or indirectly having any association with competing businesses. *See, e.g., VisionAIR*, 167 N.C. App. at 508–09; *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 308 (1994).

34. Additionally, "[a] restriction as to territory is reasonable only to the extent it protects the legitimate interests of the employer in maintaining [its] customers." *Hejl v. Hood, Hargett & Assocs., Inc.*, 196 N.C. App. 299, 306 (2009) (quoting *Manpower, Inc. v. Hedgecock*, 42 N.C. App. 515, 523 (1979)). "Ordinarily, a covenant's geographic scope will be found reasonable if it encompasses the area served by the business that the covenant protects[.]" *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 698 (2016) (citing *Thompson v. Turner*, 245 N.C. 478, 481–82 (1957)).

35. The Dinkheller Agreement, and specifically Paragraph 7, contains the non-compete provision at issue in this case. Paragraph 7 provides that

> During the period in which Employee is employed by or otherwise affiliated with the Company and for a period of twelve (12) months following the last day of Employee's affiliation with the Company (the "Restricted Period"), Employee will not, without the prior written consent of the Company:
>
> a. For Employee or on behalf of any other person or entity, directly or indirectly, either as principal, partner, stockholder, officer, director, member, employee, consultant, agent, representative or in any other capacity, provide services to or engage with any business within the Restricted Territory (as defined below) which is directly or indirectly Competitive (as defined in Section 1) with

the business of the Company, to the extent such services or engagement are the same as, or substantially similar to, the services that Employee performed for the Company during the two (2) year period preceding Employee's separation from employment with the Company. Nothing contained herein will preclude Employee from purchasing or owning securities of any such business if such securities are publicly traded, and provided that Employee's holdings do not exceed one percent (1%) of the issued and outstanding securities of any class of securities of such business.

(Agt. at ¶ 7.) Further, the Dinkheller Agreement defines "Restricted Territory" as

any country, state, region, territory or geographic location in which Employee provided services to or on behalf of the Company or within which Employee had a material presence or influence for the Company, within the two (2) year period preceding Employee's separation from employment with the Company.

(Agt. at ¶ 3.b.)

36.     Defendants raise a number of arguments in support of their Motion, which Defendants contend, when read together, support their contentions that "the [Dinkheller] Agreement is unenforceable because the time, territory, and scope of the restrictions are overbroad, and the [Dinkheller] Agreement violates North Carolina public policy because it constitutes an unreasonable restraint on trade." (Memo. Supp. Mot. 9, ECF No. 56 [Br. Supp.].)

37.     First, Defendants argue that by inclusion of the prohibition that Dinkheller shall not "provide services to or engage with any business within the Restricted Territory . . . which is *directly or indirectly* Competitive" to Atkore, the Dinkheller Agreement is rendered unenforceable. (Br. Supp. 9.)

38.     Second, Defendants contend that by defining the word "Company" to mean "Atkore International, Inc., [and] its parents, subsidiaries, affiliates, successors, and

assigns[,]" the non-compete is overly broad in scope as it relates to which businesses are deemed "Competitive" given it is not limited to the business of Atkore alone. (Br. Supp. 10.) Defendants argue that as a result of this definition, the "scope of prohibited activities includes products or services which were under development by any of Atkore's related entities, regardless of whether Dinkheller even knew that those products or services were planned" by Atkore. (Br. Supp. 12.)

39. Third, Defendants contend the temporal restrictions are overly broad, as the non-compete provision "applies 'for twelve (12) months' after Dinkheller's separation from [Atkore] and also contains a two-year lookback period[,]" along with an extension of "one-to-two years if certain actions occur." (Br. Supp. 13.) As a result, Defendants argue that "the temporal restrictions in the [Dinkheller] Agreement total three years at a minimum, and may extend up to five years," which Defendants argue is unreasonable. (Br. Supp. 13.)

40. Fourth and finally, Defendants argue that the geographic scope is overly broad. Defendants note that Atkore has alleged that through his leadership roles, "Dinkheller had a national influence over the water pipe expansion initiative and the electrical pipe business, both of which are nationwide businesses for Atkore[.]" (Br. Supp. 14 (citing Am. Compl. ¶ 44).) Defendants argue that according to the Dinkheller Agreement, since Dinkheller could not provide services to "any business within the Restricted Territory[,]" and the Restricted Territory includes any "country, state, region, territory or geographic location" where Dinkheller "provided services

. . . [or] had a material presence or influence" on Atkore, this "spans the entirety of Atkore's . . . operations in the Unites States, if not the globe." (Br. Supp. 14.)

41. Atkore responds by arguing that Defendants overlook that the "noncompete is expressly limited to prohibiting only those duties that are the same or substantially similar to the services he provided during the last two years of his Atkore employment." (Pl.'s Resp. Mot. 6, ECF No. 78 [Br. Opp.].) Additionally, Atkore picks apart each of Defendants' arguments, as discussed above, on the basis that the case law relied upon as to each argument is not analogous to the facts of this case. (Br. Opp. 8–10.)

42. The Court concludes that, on the facts as pleaded, the Dinkheller Agreement is overly broad and unreasonable as a matter of law. The Court finds that the time, scope, and geographic restrictions, when considered as a whole, are overly broad and not reasonably limited to protecting Atkore's business interests. The time restrictions—including the two-year lookback period—paired with the broad definition of the "Company," which could encompass many entities beyond Atkore, and the far-reaching geographic restriction, which essentially covers the entire country given the allegations within the Amended Complaint, all support Defendants' contention that the Dinkheller Agreement is overly broad and unenforceable as a matter of law.

43. For this reason, the Court hereby **GRANTS** the Motion in part as to Count One based on the non-competition restrictive covenant detailed in Paragraph 7 of the Dinkheller Agreement, and Count One is **DISMISSED** with prejudice.[2]

**B.** **Count Two: Tortious Interference with Contract against National Pipe**

44. Atkore has asserted Count Two against National Pipe, alleging that "National Pipe intentionally induced Dinkheller to commence work for National Pipe in violation of" the non-competition and non-disclosure restrictive covenants found within the Dinkheller Agreement. (Am. Compl. ¶ 81.)

45. To state a claim for tortious interference with contract, a complaint must allege that:

> (1) a valid contract [exists] between the plaintiff and a third-person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Lab., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988). As this Court has often noted, "[t]he pleading standards for a tortious interference with contract claim are strict." *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *16 (N.C. Super. Ct. Mar. 27, 2017) (alteration in original) (quoting *Urquhart v. Trenkelbach*, 2017 NCBC LEXIS 12 at *15 (N.C. Super. Ct. Feb. 8, 2017)).

46. First, Atkore has alleged that it "has a valid and enforceable employment agreement with Dinkheller" which contains "provisions against the use or disclosure

---

[2] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013).

of Atkore's confidential information and trade secrets" and "restrictions against competing with Atkore for a limited period of time within certain geographic areas." (Am. Compl. ¶ 79.)

47. As to the non-competition provision within the Dinkheller Agreement, the Court has found that provision to be unenforceable as a matter of law. (*See supra* ¶ 35.) As a result, to the extent Count Two is based on the non-competition provision of the Dinkheller Agreement, the Motion is **GRANTED** and Count Two is **DISMISSED** with prejudice to that limited extent.

48. The Court now turns its analysis to the non-disclosure provision within the Dinkheller Agreement to determine whether Atkore has sufficiently alleged Count Two on this basis.

49. When assessing the validity of restrictive covenants in an employment agreement, North Carolina law distinguishes between restrictive covenants—which restrain trade—and confidentiality agreements—which are only meant to prevent the disclosure or use of confidential information. *See Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at **10 (N.C. Super. Ct. Oct. 15, 2015).

50. "Unlike non-competition and non-solicitation provisions, a nondisclosure provision is generally not considered to be a restraint on trade." *Prometheus Grp. Enters., LLC v. Gibson*, 2023 NCBC LEXIS 42, at **24 (N.C. Super. Ct. Mar. 21, 2023). Accordingly, a "nondisclosure provision is not subjected to the same level of scrutiny as the non-competition and non-solicitation provisions" of an employment agreement. *Id.* at **25. For this reason, "[s]uch agreements may, therefore, be

upheld even though the agreement is unlimited as to time and area[.]" *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at **31 (N.C. Super. Ct. Nov. 3, 2011).

51. Dinkheller's non-disclosure obligations are outlined in paragraph 7 of the Dinkheller Agreement. (*See* Agt. at ¶ 7; *see supra* ¶ 14.)

52. Defendants contend Count Two should be dismissed on the basis that Atkore has only alleged "conclusory allegations to support this claim which should be ignored." (Br. Supp. 22.) Atkore disagrees with this characterization of its allegations, arguing it has "set forth factual allegations supporting the elements of its tortious interference claim" against National Pipe, including National Pipe's "knowledge of Dinkheller's noncompete and [National Pipe's] wrongful purpose of inducing Dinkheller's breach to stifle fair competition in the marketplace[.]" (Br. Opp. 13.)

53. Atkore alleges that (1) the Dinkheller Agreement is a "valid and enforceable employment agreement," (Am. Compl. ¶ 79); (2) "National Pipe was notified in writing of Dinkheller's employment agreement . . . prior to Dinkheller commencing employment for National Pipe," (Am. Compl. ¶ 80); (3) National Pipe interfered with the Dinkheller Agreement by "placing Dinkheller in a position where he has disclosed and is utilizing Atkore's confidential information and trade secrets," (Am. Compl. ¶ 83); (4) National Pipe's conduct was done "without justification[,]" (Am. Compl. ¶ 87); and (5) Atkore is entitled to recover for "the resulting actual damages it has suffered[,]" (Am. Compl. ¶ 90). The Court finds Atkore's allegations sufficient

at this stage to state a claim for tortious interference with contract against National Pipe as to the non-disclosure provision within the Dinkheller Agreement.

54. Therefore, the Court hereby **DENIES** the Motion in part as to Count Two to the extent it is based on the non-disclosure provision within the Dinkheller Agreement.

C. **Counts Three and Four: Breach of Fiduciary Duty & Constructive Fraud Against Dinkheller**

55. Atkore has asserted Count Three against Dinkheller for breach of fiduciary duty, alleging that Dinkheller "owed Atkore fiduciary duties given the relationship of trust and confidence between the two parties," (Am. Compl. ¶ 92), and that he breached his duties when he "knowingly and intentionally put his interests and those of National Pipe ahead of Atkore's," (Am. Compl. ¶ 97). Similarly, Atkore has asserted Count Four against Dinkheller for constructive fraud, alleging that "[a] relationship of trust and confidence existed between Atkore and Dinkheller," (Am. Compl. ¶ 102), and that Dinkheller "took advantage of that position of trust in order to benefit himself," (Am. Compl. ¶ 103).

56. In order to establish a claim for breach of fiduciary duty, plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to plaintiff. *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68 (2006). "To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the

transaction." *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620 (2012).

57.     North Carolina's courts have consistently held that an employer-employee relationship is not a fiduciary one, even where the employee has significant management authority, absent some allegation that the employee exercised dominance and control over his employer. *See Austin Maint. Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 410 (2012) (finding no breach of fiduciary duty because "any confidence that Plaintiff reposed in [employee] consisted of nothing more than relying on him to competently perform his assigned duties"); *Dalton v. Camp*, 353 N.C. 647, 652 (2001) (quoting *King v. Atl. Coast Line R.R. Co.*, 157 N.C. 44, 62–63 (1911)) ("Under the general rule, 'the relation of employer and employee is not one of those regarded as confidential.' "); *Allegis Grp., Inc. v. Zachary Piper LLC*, 2013 NCBC LEXIS 12, at *32 (N.C. Super. Ct. Feb. 25, 2013) (holding that "basic management responsibilities" do not support a fiduciary relationship); *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at *16 (N.C. Super. Ct. Oct. 19, 2007) ("Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led to the employer being subjugated to the 'improper influences or domination of [its] employee.' " (citation omitted)).

58.     "Where an employee is neither an officer nor a director, extraordinary circumstances are necessary to impose a fiduciary duty arising out of the employment relationship." *Southeast Air Charter, Inc. v. Stroud*, 2015 NCBC LEXIS 82, at *16

(N.C. Super. Ct. Aug. 17, 2015) (citing *Dalton*, 353 N.C. at 652). These "extraordinary circumstances" occur when an employer is "subjugated to the improper influences or domination of his employee." *Dalton*, 353 N.C. at 652; *see also DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at \*21–22 (N.C. Super. Ct. May 12, 2015) (holding that the plaintiff failed to allege "the extraordinary or special type of employer-employee relationship that gives rise to a fiduciary duty" because the facts pleaded "failed to allege that Thagard enjoyed the sort of domination or influence over DSM that our courts have found necessary to create a fiduciary duty").

59. Defendants argue that Counts Three and Four should be dismissed, as the Amended Complaint "lacks sufficient facts to establish Dinkheller had any fiduciary duty to Atkore[,]" a fundamental element to both Counts Three and Four. (Br. Supp. 23, *see also* Br. Supp. 25.) Defendants support this contention by arguing the "allegations confirm the relationship between Dinkheller and Atkore is that of a standard employer/employee," and that the "Amended Complaint confirms Dinkheller worked under the supervision of others and his authority was subservient to those higher-ranking individuals." (Br. Supp. 24.)

60. In response, Atkore argues its allegations are sufficient at this stage, providing that "Dinkheller's influence and assumption of a specialized, new senior level position to oversee and execute Atkore's water expansion initiative" established a fiduciary duty between the two parties. (Br. Opp. 13.)

61. While Atkore alleges that Dinkheller was a senior-level employee with substantial managerial authority over the water pipe expansion initiative, the

pleaded facts do not show that Dinkheller possessed the type of domination and influence over Atkore that create fiduciary duties.

62.     As a result, Counts Three and Four both fail.  Therefore, the Court hereby **GRANTS** the Motion in part as to Counts Three and Four, and Counts Three and Four are **DISMISSED** without prejudice.

### D.     Count Five: UDTPA Against Defendants

63.     Atkore brings Count Five against both Dinkheller and National Pipe, alleging that Defendants have violated the UDTPA through "Dinkheller's use of his specialized leadership position to continue procuring Atkore's highly confidential proprietary information on its strategies for water pipe expansion and optimization[,]" while "simultaneously conspiring with National Pipe to engage in competitive employment in disregard of fiduciary duties, confidentiality obligations and restrictive covenants." (Am. Compl. ¶ 108.)

64.     To state a claim for a violation of N.C.G.S. § 75-1.1 (UDTPA), a plaintiff must allege that "(1) defendant committed an unfair and deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton,* 353 N.C. at 656.  "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.*

65.     Defendants seek dismissal of Count Five, arguing Count Five "rests upon other claims which should be dismissed for the reasons outlined herein and should be dismissed on that basis alone." (Br. Supp. 30.)  Atkore does not raise any opposition as to Count Five in its response brief, and as a result, the Court deems Defendants'

request for dismissal of Count Five to be unopposed. *See* BCR 7.2 ("The function of all briefs required or permitted by this rule is to define clearly the issues presented to the Court and to present the arguments and authorities upon which the parties rely in support of their respective positions. A party should therefore brief each issue and argument that the party desires the Court to rule upon and that the party intends to raise at a hearing.").

66. Therefore, the Court hereby **GRANTS** the Motion as to Count Five, and Count Five is **DISMISSED** without prejudice.

### E. Count Six: Misappropriation of Trade Secrets Against Defendants

67. Atkore has asserted Count Six against both Dinkheller and National Pipe, alleging that "Dinkheller had access to, reviewed and used Atkore's trade secrets"; "Dinkheller then disclosed this trade secret information to National Pipe, as well as to the public in his affidavit in this case"; "[t]hese trade secrets are not easily or readily ascertainable through independent development or reverse engineering"; and Atkore "engages in reasonable efforts to maintain the secrecy of such trade secret information." (Am. Compl. ¶¶ 112–17.)

68. The North Carolina Trade Secrets Protection Act defines a trade secret as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> > a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3). "To plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec*, 370 N.C. at 609 (citation omitted).

69. Defendants seek dismissal of Count Six for two reasons, arguing Atkore has failed to identify both the trade secrets at issue, and any acts of misappropriation thereof, with sufficient particularity. (Br. Supp. 27–30.)

70. First, Defendants contend that Atkore's allegedly misappropriated trade secret information is "not entitled to protection as a 'trade secret' and cannot support a claim for misappropriation." (Br. Supp. 28.) Second, Defendants contend Atkore's allegations regarding misappropriation are "just the 'inevitable disclosure' doctrine dressed up as an alleged act of misappropriation." (Br. Supp. 29.)

71. Atkore rebuts this argument, pointing out that it "pled specifically identifiable confidential, trade secret information that Dinkheller misappropriated from a PowerPoint document when he shared that same information in his public affidavit[.]" (Br. Opp. 4 (citing ECF No. 33 at ¶¶ 2–4).) Atkore argues that "this level of specificity gives sufficient notice of the identity of the trade secrets at issue in this case." (Br. Opp. 5.) Atkore further argues that it has "pled sufficient factual allegations to support its claim" given that it has alleged "Dinkheller has misappropriated the above-referenced trade secrets by taking such information from

the PowerPoint and disclosing the combination of all of it to [National Pipe] and the public without Atkore's consent." (Br. Opp. 6.)

72. The Court agrees as to Dinkheller. At this stage, the Court finds that Atkore has sufficiently identified such trade secrets as the information contained in the PowerPoint presentation and has alleged that such information was subsequently shared on the public record in this matter through Dinkheller's affidavit, (*see* ECF No. 33).

73. As to National Pipe, Atkore alleges that "Dinkheller's use and/or disclosure of Atkore's confidential information and trade secrets has occurred and is currently occurring[,]" (Am. Compl. ¶ 119). These allegations, paired with the allegations discussed herein regarding National Pipe interfering with the Dinkheller Agreement by "placing Dinkheller in a position where he has disclosed and is utilizing Atkore's confidential information and trade secrets," (Am. Compl. ¶ 83), are minimally sufficient at this early stage to state a claim against National Pipe for misappropriation of trade secrets.

74. Therefore, the Court hereby **DENIES** the Motion in part as to Count Six.

## VI. CONCLUSION

75. **THEREFORE**, the Court hereby **GRANTS** in part and **DENIES** in part the Motion as follows:

    a. The Motion is **GRANTED** as to Count One, and Count One is **DISMISSED** with prejudice;

b. The Motion is **GRANTED** as to Count Two to the extent it relies on the non-compete provision within the Dinkheller Agreement, and Count Two is **DISMISSED** with prejudice to that limited extent. The Motion is **DENIED** as to Count Two to the extent it relies on the non-disclosure provision within the Dinkheller Agreement;

c. The Motion is **GRANTED** as to Count Three, and Count Three is **DISMISSED** without prejudice;

d. The Motion is **GRANTED** as to Count Four, and Count Four is **DISMISSED** without prejudice;

e. The Motion is **GRANTED** as to Count Five, and Count Five is **DISMISSED** without prejudice; and

f. The Motion is **DENIED** as to Count Six.

**SO ORDERED**, this the 10th day of April, 2025.

/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge